**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE ZETA GLOBAL DATA PRIVACY LITIGATION

THIS DOCUMENT RELATES TO:

*All Cases*
1:25-cv-05780-PAE
1:25-cv-05823-PAE

Case No. 1:25-cv-05780-PAE

**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Hon. Paul A. Engelmayer

Plaintiffs R.E.A., K.G., and Diane Ayerdi (collectively, the "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this First Amended Consolidated Class Action Complaint ("Amended Complaint") against Defendants DotDash Meredith, Inc. ("DotDash"), Zeta Global Corporation, and Zeta Global Holdings Corporation (together, "Zeta," and, collectively with DotDash, the "Defendants"), for violations of federal, state, and common law set forth herein in connection with Defendants' unlawful data interception, collection, and use for profit.

Plaintiffs make the following allegations based upon personal knowledge as to themselves, as well as upon information and belief, and based on the investigation of counsel:

## INTRODUCTION

1. In an increasingly digital world, Americans must rely on the internet for numerous different tasks. Whether utilizing digital storefronts, seeking medical information, or using online banking systems, much of what consumers do on the internet creates thousands of individual data points of highly sensitive information.

2. Consumers have a fundamental expectation of privacy when they engage in online activity. This includes the expectation that corporations will not engage in surreptitious, systematic, and widespread surveillance of consumers' online activity without their express consent. Several laws, including those described herein, protect this inherent right to privacy and right to be left alone.

3. However, consumer information is highly valuable to many digital retailers and service providers. This is because the more data they can collect about an individual, the better they can target potential customers and, in turn, earn more profits.

4. As a result, a new industry of technology companies whose sole focus is to enable the targeting of individual consumers has arisen. These companies acquire personalized data specifically to identify and target consumers across digital channels or to sell it to other companies who engage in this practice. Each of these companies that traffic in consumers' personal and identifiable data must ensure they are complying with existing laws, consumer expectations, and industry standards. First and foremost, this includes obtaining actual and affirmative consent prior to collecting, using, or processing consumers' data.

5. One of the largest corporations in this new industry is Zeta. Zeta positions itself as a "data driven cloud platform" providing consumer intelligence and marketing technology.

6. The bedrock of its business model is consumer data—that it claims is "opt-in" data—from hundreds of millions of consumers. Zeta turns a profit by processing and enriching this data to build highly detailed, individually identifiable user profiles. Zeta then offers its clients access to those profiles to serve targeted ads, and provides its own ad-targeting solutions, including a demand-side platform ("DSP")—part of the real-time bidding ("RTB") process that enables online advertising—which allows clients to bid on online advertising space using these enriched profiles. Zeta also operates a supply-side platform ("SSP")—the other side of the RTB process—which is used by "publishers" i.e., websites selling ad space on their own storefronts and web properties. Given this combination of services, Zeta is unique in that it controls both the collection of private data and profiling of individuals, as well as the means for advertisers and publishers to target individuals using these profiles through the RTB process.

7. As Zeta acknowledges in its Form 10-K Annual Report for the fiscal year ended December 31, 2024 ("2024 Annual Report"), its ability "to collect and use online [consumer] data"

is crucial to its entire business model and that, without this data, it would not have "sufficient insight[s]" into "consumer's activity" to sustain its business.

8. Because Zeta is a DSP, Zeta's customers can use these profiles to bid on ads and target individuals based on their specific interests, queries, and behaviors through various advertising channels, including but not limited to email, social media, website ad spaces, chat applications, connected TV devices, and video popups. Zeta provides its DSP customers with free access to the consumer profiles it develops. And as an SSP, combined with its role as a data aggregator, Zeta knows which consumers are currently on a publisher's website and which targeted ads are the most likely to result in an advertiser's desired action, i.e., sign up, page view, purchase, etc.

9. Zeta maintains over 200 million profiles on American consumers that fuel its business model, representing one of the "largest compilations of personal data relating to U.S. and international consumers in the world." According to Zeta, these profiles consist of "a comprehensive mix of proprietary, partner, and publicly available data . . . includ[ing] an average of more than 2,500 attributes per individual[,]" which Zeta links to specific individuals and consists of demographic information, behavioral data, psychographic data, transactional information, and other data regarding consumer preferences (collectively, the "PII").

10. As of 2025, nearly 1,200 companies use Zeta, including 40 percent of the companies on the Fortune 100 list. Zeta represents that the key benefit to using Zeta Marketing Platform ("ZMP") is that it "lets you reach consumer with high impact omnichannel campaigns powered by next generation AI." In essence, ZMP's core function is to run the PII of nearly every single U.S. consumer who uses the internet through AI in order to best profile and target these consumers with omnichannel advertising campaigns for profit.

11. Zeta acquires this PII through inconspicuous website tracking "pixels" embedded on third-party websites and email communications, through "consent farms" set up by Zeta and/or its subsidiaries, data partners and publishers, or through other data aggregators who also traffic in this type of sensitive information.

12. Zeta's claims that it only obtains "opt-in" data, but that is a lie. Zeta's entire business model relies on violating privacy rights and collecting PII from unwitting consumers, the exact opposite of consent-to data collection.

13. Zeta all but admits this. At the Zeta Data Summit in December 2024, Zeta implicitly acknowledged that for approximately 245 million consumers for whom it maintained AI-enriched user profiles, it never actually obtained "opt-in" consent from any of these consumers. Instead, Zeta was apparently relying on "publishers" (i.e., its own clients who use its services, such as its pixel technology) to obtain consent from Plaintiffs and Class members on its behalf through their own respective terms and policies. However, a review of several of Zeta's customers' privacy policies show there is no mention of Zeta or its detailed profiling of everyday consumers for its own profit in its clients' policies. Thus, Zeta does ***<u>not</u>*** have consent—let alone "opt-in" consent—from these 245 million consumers whose data it uses and sells access to.

14. Zeta separately claims it obtained consent from 110 million of these consumers to target and profile them based on the fact that these consumers had agreed to receive email communications (largely newsletters) from individual websites. Consumers like Plaintiffs and Class members had no idea that when they agreed to receive emails, for example, newsletters from People Magazine (one of Zeta's clients), that Zeta treated this as license to individually target and profile them across the internet for their own monetary gain. In essence, Zeta's own presentation

confirmed that its claim that its data collection and profiling activity was "opted in" was anything but.

15. And this is only part of the picture. Recent reports, including one published by Culper Research ("Culper"), confirmed that Zeta's deceptive practices reach far beyond intercepting data through its pixel used by its customers through bogus "opt-in" claims. According to Culper, Zeta acquired several companies—including Apptness Media Group, LLC and ArcaMax Publishing, Inc.—solely for the purpose of "farming" consumers' information. Through these companies, Zeta operates websites that promise exclusive deals and offers in exchange for consumers handing over their private information. However, none of these deals and offers actually exist, and just are more of the same scheme to acquire consumers' personal data using false pretenses.

16. To make matters worse, Zeta's 2024 Annual Report confirms that Zeta has no intention of respecting individuals' privacy rights either now or going forward. In this report, Zeta acknowledged that there were "new tools used by consumers to limit data collection" including Apple's "Do Not Track" feature that can limit the ability of companies to track individual consumers. Rather than acknowledge that these methods exist precisely to protect consumers' privacy online and that it should honor this privacy expectation, Zeta was only concerned about how these tools may "harm [Zeta's] operating results and financial condition." Stated differently, Zeta cares more about continuing to make money than addressing the privacy concerns raised by its conduct.

17. Defendants' violations of federal, state, and common law have the intended purpose of violating consumer privacy. Among the hundreds of millions of victims of Zeta's invasive

privacy practices are consumers who use at least one of more than a thousand businesses that use Zeta's technology, including DotDash which operates People Magazine.

18. Plaintiffs, on behalf of themselves and Class members, bring this proposed class action on behalf of all consumers whose PII was intercepted, collected, enriched, and monetized by Defendants. Plaintiffs seek redress, in the form of monetary relief to be determined at trial and injunctive relief for the injury and damages that have been incurred and continue to be incurred as a result of Defendants' continuing unlawful conduct.

## **JURISDICTION AND VENUE**

19. This action arises under federal, state, and common law.

20. *Subject Matter and Supplemental Jurisdiction.* Plaintiffs bring this Action under the Electronic Communications Privacy Act (18 U.S.C. § 2510, *et seq*.), such that subject matter jurisdiction is proper under 28 U.S.C. §§ 1331, 1332(d), 1337(a), and 1367. This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337 because Plaintiffs assert claims arising under federal law. Additionally, this Court has supplemental jurisdiction over Plaintiffs' state and common law claims under 28 U.S.C. § 1367 because all of their claims arise from the same facts and circumstances and form part of the same case or controversy.

21. This Court also has subject matter jurisdiction over Plaintiffs' state law and common law claims under the Class Action Fairness Act of 2005 (28 U.S.C. § 1332(d)) ("CAFA"). This Court has subject matter jurisdiction under CAFA because the amount in controversy exceeds the sum of $5,000,000 (exclusive of costs and interest), there are more than 100 putative members of the Class, and one or more of the Class members is a citizen of a different state than that of one or more of the Defendants. Namely, Plaintiffs Ayerdi and K.G. are domiciled in California whereas Zeta is headquartered in New York.

22. *Personal Jurisdiction.* This Court has personal jurisdiction over Defendants because the principal place of business of both Defendants is in New York. Additionally, this Court has personal jurisdiction over Defendants because Defendants are registered to do business in New York and a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in New York, including Defendants' interception and use of Plaintiffs' PII.

23. *Venue.* Venue is proper in this District under 28 U.S.C. §1391(b), (c), and (d), because a substantial portion of the conduct described in this Amended Complaint was carried out in this District. Further, Defendants maintain substantial business operations in this District.

## PARTIES

### PLAINTIFFS

***Plaintiff R.E.A.***

24. Plaintiff R.E.A. was domiciled in Suffolk County, New York during the Class Period and is now recently domiciled in Guilford County, North Carolina.

25. During the Class Period, Plaintiff R.E.A. used the storefronts and services of numerous online retailers, including those of Zeta's business clients, such as Horoscope.com, All Recipes, Southern Living, and U.S. Weekly.

26. When Plaintiff R.E.A. used Horoscope.com, she created an account and logged in using her email address and other information. Unbeknownst to Plaintiff R.E.A, Zeta intercepted her PII from the online services she used, including Horoscope.com, through its pixel and related technology on this website, processed this information, and created and/or supplemented a digital profile maintained by Zeta.

27. Zeta's pixel tracking technology is also present on several other websites Plaintiff R.E.A. used. Through this technology Zeta, unbeknownst to Plaintiff R.E.A., populated its profile

of R.E.A. with specific pages that R.E.A. interacted with and the content of R.E.A.'s searches. Zeta processed, stored, and enriched this data to target Plaintiff R.E.A. with its business clients' ads.

28. Zeta used its technology to track and profile Plaintiff R.E.A. across the internet, creating approximately 2,500 data points on Plaintiff R.E.A., including on the web, mobile devices, connected TVs, and other platforms.

29. Zeta and its business clients profited from this data collection apparatus, which fuels their ability to serve targeted ads, including facilitating real-time bidding for digital ad spaces (on websites, applications, Connected TVs, and elsewhere online) through Zeta's DSP and SSP solutions that would ultimately be served to Plaintiff R.E.A specifically.

30. Plaintiff R.E.A. did not consent to Zeta intercepting her PII or private communications for profit and did not consent to Zeta assigning and using unique identifiers to track her across internet-enabled services and devices.

***Plaintiff K.G.***

31. Plaintiff K.G. is and was domiciled in Los Angeles County, California during the Class Period.

32. During the Class Period, Plaintiff K.G. used the storefronts and services of numerous online retailers, including those of Zeta's business clients such as Horoscope.com, All Recipes, Food & Wine, MyRecipes, Southern Living, and US Weekly. Plaintiff K.G. also has an application membership and subscription to All Recipes.

33. When Plaintiff K.G. used All Recipes, she created an account and logged in using her email address and other information. Unbeknownst to Plaintiff K.G., Zeta intercepted her PII from the online services she used, including All Recipes, through its pixel and related technology

on this website, processed this information, and created and/or supplemented a digital profile maintained by Zeta.

34. Zeta's pixel tracking technology is also present on several other websites Plaintiff K.G. used. Through this technology Zeta, unbeknownst to Plaintiff K.G., populated its profile of K.G. with specific pages that K.G. viewed or the content of K.G.'s searches. Zeta processed and stored this data to target Plaintiff K.G. with its business clients' ads.

35. Zeta used its technology to track and profile Plaintiff K.G. across the internet, creating approximately 2,500 data points on Plaintiff K.G., including on the web, mobile devices, connected TVs, and other platforms.

36. Zeta and its business clients profited from this data collection apparatus, which fuels their ability to serve targeted ads, including facilitating real-time bidding for digital ad spaces (on websites, applications, Connected TVs, and elsewhere online) through Zeta's DSP and SSP solutions that would ultimately be served to Plaintiff K.G. specifically.

37. Plaintiff K.G. did not consent to Zeta intercepting her PII or private communications for profit and did not consent to Zeta assigning and using unique identifiers to track her across internet-enabled services and devices.

***Plaintiff Diane Ayerdi***

38. Plaintiff Diane Ayerdi is and was domiciled in San Francisco County, California during the Class Period.

39. During the Class Period, Plaintiff Ayerdi used the storefronts and services of numerous online retailers, including those of Zeta's business clients such as People.com.

40. When Plaintiff Ayerdi used People.com, she created an account and logged in using her email address and other information. Unbeknownst to Plaintiff Ayerdi, Zeta intercepted her

PII from the online services she used, including People.com, through its pixel and related technology on this website, processed this information, and created and/or supplemented a digital profile maintained by Zeta.

41. Zeta's pixel tracking technology is also present on several other websites Plaintiff Ayerdi used. Through this technology, Zeta, unbeknownst to Ayerdi, populated its profile of Ayerdi with specific pages that Ayerdi viewed or the content of Ayerdi's searches. Zeta processed and stored this data to target Plaintiff Ayerdi with its business clients' ads.

42. Zeta used its technology to track and profile Plaintiff Ayerdi across the internet, creating approximately 2,500 data points on Plaintiff Ayerdi, including on the web, mobile devices, connected TVs, and other platforms.

43. Zeta and its business clients profited from this data collection apparatus, which fuel their ability to serve targeted ads, including facilitating real-time bidding for digital ad spaces (on websites, applications, Connected TVs, and elsewhere online) through Zeta's DSP and SSP solutions that would ultimately be served to Plaintiff Ayerdi specifically.

44. Plaintiff Ayerdi did not consent to Zeta intercepting her PII or private communications for profit and did not consent to Zeta assigning and using unique identifiers to track her across internet-enabled services and devices.

**DEFENDANTS**

***Defendant DotDash Meredith, Inc.***

45. Defendant DotDash is a Delaware corporation headquartered in New York with its principal place of business located at 225 Liberty Street, 4th Floor, New York, New York 10281.

46. Defendant DotDash uses Zeta's pixel technology, provided through its subsidiary LiveIntent, on its website and embeds this technology in email correspondence sent to subscribers of its newsletter.

47. Using this technology, Defendant DotDash facilitated Zeta's interception of Plaintiffs' and Class members' private data and PII, which Zeta used to develop AI-enriched user profiles for targeted advertising. Accordingly, Defendant DotDash directly contributed to the user profiles maintained, created, and sold by Zeta.

***Defendant Zeta Global Corporation***

48. Defendant Zeta Global Corporation is a Delaware corporation headquartered in New York with its principal place of business located at 3 Park Avenue, 33rd Floor, New York, New York 10016.

***Defendant Zeta Global Holdings Corporation***

49. Defendant Zeta Global Holdings Corporation is a Delaware corporation headquartered in New York with its principal place of business located at 3 Park Avenue, 33rd Floor, New York, New York 10016. Defendant Zeta Global Holdings Corporation is publicly traded; its common stock trades on the New York Stock Exchange under the ticker symbol "ZETA."

50. Zeta Global Holdings Corporation, initially called XL Marketing Corporation, was founded in 2007..

51. At all times, Zeta was admittedly aware of "numerous state laws" that create "standards relating to the privacy, security, transmission and breach reporting of personal information." This includes the CCPA, which Zeta admits in its 2024 Annual Report includes "consumer rights processes", "limitations on data uses", and "opt outs for certain uses of sensitive

data." It was also aware that "state regulators" were increasing "scrutiny regarding the collection and processing of personal information for purposes of online advertising, marketing, and analytics."

52. Nonetheless, Zeta Global Holdings Corporation knowingly and intentionally developed a deceptive data collection apparatus, relying on its profiling capabilities and tracking mechanisms, to surveil Plaintiffs and Class members across the internet. Zeta Global Holdings Corporation engaged in this conduct despite knowing that its conduct was unconsented to and at odds with users' basic expectations of digital privacy.

53. Zeta Global Holdings Corporation knew that its creation of identifiable profiles on hundreds of millions of individual consumers circumvented existing privacy protections.

54. Zeta held itself out as obtaining "opt-in" consent, despite the fact that it—as acknowledged in its own presentation—was relying solely on its customers' terms and policies, which did not disclose its conduct, and "opt-ins" its customers had obtained exclusively to send consumers email communications, as the basis for this purported consent. No reasonable company, and especially not a large data aggregator aware of current data privacy laws, could truly believe they had consent through these means to engage in the types of individualized targeting and profiling conducted by Zeta Global Holdings Corporation.

55. Moreover, Zeta Global Holdings Corporation, through a series of strategic acquisitions, set up and used "consent farms" to obtain additional PII and private data to supplement its existing user profiles. Through these consent farms, Zeta Global Holdings Corporation held itself, and/or its subsidiaries, out as providing exclusive offers and opportunities in exchange for consumers' PII and private data. However, none of these offers were real and were, in essence, a ruse to obtain more data without consent to supplement its existing consumer profiles.

56. While Zeta Global Holdings Corporation advertised its data collection apparatus as being entirely opt-in for consumers, it recently ***removed*** mentions of its opt-in data collection system in its 2024 Annual Report after recent scrutiny. This includes the report by Culper, published on November 13, 2024, which noted that Zeta Global Holdings Corporation collected a large portion of customer data from a network of "sham websites that hoodwink millions of consumers each month into handing their data over to Zeta under false pretenses." Shortly thereafter, a securities class action ensued, alleging that, among other things, Zeta Global Holdings Corporation utilized predatory consent farms to collect user data. Zeta Global Holding Corporation's recent removal of these representations confirms its prior claims that its data collection was exclusively "opt-in" was a lie.

57. Zeta offers its services to websites, mobile applications, advertisers, data brokers, and other downstream purchasers of consumer PII. Zeta knowingly and intentionally used its identifiers, various data collection systems, and the resulting PII it obtained to profile online users and facilitate targeted advertisements for profit.

## FACTUAL ALLEGATIONS

### *The Rise of the Data Aggregator*

58. In the year prior to COVID-19, American consumers spent approximately $500 billion making online purchases; Americans now spend approximately $1.3 trillion annually on internet purchases. Sales numbers are anticipated to approach $2 trillion by the end of 2029.

59. Against this backdrop, retailers selling products and services on the internet feel increasing pressure to have data that allows them to target individual users themselves. This has led to data aggregators playing a powerful role in digital spaces. Rather than presenting generic advertisements to anonymous, aggregated groups of potential customers, retailers now prioritize

the access that data aggregators give them to individuals themselves. Many data aggregators provide thousands of highly sensitive data points on each individual consumer to facilitate this process.

***<u>Zeta's Business</u>***

60. Founded in 2007, Zeta describes itself as "a leading AI-powered omnichannel data-driven cloud platform that provides enterprises with consumer intelligence and marketing automation software." It "empower[s] [its] customers to target, connect and engage consumers through software that delivers personalized marketing across all addressable channels, including email, social media, web, chat, Connected TV [] and video, among others."

61. With respect to what Zeta offers to its 1,200 consumer-facing business customers, Zeta states, "[o]ur Generative AI (GenAI)-driven marketing solutions enable brands to personalize experiences at scale, measure impact with precision and optimize marketing spend to increase return on investment."

62. The core of Zeta's business is called the Zeta Marketing Platform, or ZMP, powered by individualized consumer data.

63. Using artificial intelligence, ZMP functions as a marketing platform that uses consumers' identifying data in order to best target specific consumers. According to Zeta, "[l]everaging GenAI and machine learning, the ZMP processes billions of structured and unstructured data signals to predict consumer intent, optimize messaging and drive personalized messaging across all channels."

64. Zeta gets access to this data by intercepting data directly from third-party websites, among other means. To do so, Zeta uses various types of technology such as tracking code (e.g., pixel tracking) and application programing interfaces ("APIs"). These technologies intercept

consumers' data from individual websites, transmitting it to Zeta's servers so that Zeta can store and enrich the data through Zeta's algorithm.

65. Zeta supplements the data in the ZMP platform through deceptive websites run by companies it has acquired, including Apptness Media Group, LLC (acquired in 2021) and ArcaMax Publishing, Inc. (acquired in 2022). These companies serve as "fronts" that promise consumers exclusive offers, deals, and job opportunities. For instance, as alleged by Culper, the Arcamax website promised "[a]ccess to members only offers" by providing the consumers' first and last name, even though there were no exclusive offers to unlock. After entering this information, ArcaMax continues to bombard the consumer with additional requests for more information. As a data aggregator, and acquirer of these businesses that had no real services to offer consumers, Zeta knew that the only purpose for these acquisitions was to get its hands on more consumer data under the guise of having "opt-in" consent.

66. All of this data flows into the "pillars" that power the ZMP platform and Zeta's robust user profiles, which Zeta describes in investor presentations.

67. *__Zeta's Data Set__*. Zeta claims to have data sets of profiles of more than 245 million individuals in the United States. These profiles are constructed from the data it intercepts from individual websites and its "consent farms," as well as data it obtains from other aggregators and publicly available information. On average, a profile is enriched with over 2,500 attributes per individual, including demographic, behavioral, psychographic, transactional, or other preference data.

68. ZMP takes in over one trillion data points on a monthly basis.

69. *Zeta's AI Engine*. All of the data obtained by Zeta is run through its "GenAI, machine learning, natural language processing, and predictive AI." According to Zeta, Zeta leverages AI, technology, and proprietary data within ZMP to be able to:

a. Seamlessly collect and ingest structured and unstructured data into the ZMP;

b. Quickly and reliably analyze key consumer attributes and signals;

c. Identify consumer intent by running sophisticated algorithms to analyze data;

d. Cluster related concepts and prioritize actionable insights to create intent-based graphs;

e. Create audiences comprised of individuals or affinity-driven clusters scored based on intent;

f. Forecast experience-based outcomes at both an individual and audience level;

g. Personalize content to make experiences more relevant for the consumer and profitable for the enterprises;

h. Create channel and content recommendations to optimize marketing performance;

i. Enable ZMP users to create GenAI agents and workflows, which chain discrete tasks together for automations;

j. Determine intent of a ZMP user with GenAI and recommend next actions; and

k. Leverage GenAI for the creation of campaigns, creative audiences, experiences, data onboarding processes and analysis of analytics.

70. Thus, not only does Zeta collect vast amounts of PII and private data that it should have never had access to, but it further enriches and monetizes this data for its own benefit and the benefit of its customers—all without ever obtaining consent from individual consumers whose data it harvests.

71. *__Zeta's Omnichannel Engagement__*. Because Zeta collects and ingests data from a massive number of sources, it can uniquely identify specific consumers across all of their devices and build persistent, individual-level user profiles. As described further below, these comprehensive profiles are anchored by Zeta's proprietary and persistent identifier—the Zeta ID—that it assigns to each and every user in the ZMP platform. Zeta claims that these capabilities allow its "customers to improve how they identify and engage the modern consumer who is using multiple devices and platforms (e.g., mobile, website, applications, social media, CTV and email)."

72. To further increase the efficiency of the ZMP platform, Zeta's solutions integrate with other third-party sources, including other large data aggregators like LiveRamp and Adobe, and supply-partners like PubMatic and Taboola. Through these integrations, Zeta exchanges data—including unique identifiers—with other third parties, further supplementing its ability to identify and profile consumers.

73. A major concern for the Plaintiffs and Class members is what happens to data once it enters Zeta's advertising ecosystem. Because Zeta shares identifiers and signals with an untold number of partners, ad exchanges, and supply-side platforms, Plaintiffs' and Class members' data is exposed to an unquantifiable number of third parties, further compounding the privacy violations caused by Zeta.

74. *__Zeta's Data Performance Optimization__*. According to Zeta, the final pillar of Zeta's ZMP platform is performance optimization. Zeta provides AI-powered analytics to its customers to monitor and improve the effectiveness of their advertising campaigns by reviewing, in real-time, how they are currently performing and modifying accordingly.

***How Zeta Obtains & Uses Consumers' Private Data***

75. Various businesses use Zeta's ZMP platform and its extensive database of consumer profiles, which is advertised as providing "a single, comprehensive view of [] customers and prospects, their buying behaviors, and their brick-and-mortar and digital retail experiences."

76. A primary piece of Zeta's ZMP platform is its ability to profile specific consumers. Zeta has a proprietary "identity graph" that it uses to link online and offline identifiers associated with a specific individual all under one consistent consumer profile. This identity graph is built on millions (if not billions) of data points that Zeta obtains through its tracking technology, consent farms, data partners, and the RTB process, as described herein.

77. At the center of Zeta's identity graph and its consumer profiles is its persistent, non-changeable identifier called the Zeta ID. All online and offline identifiers Zeta obtains about a person are stored in the individual user profiles anchored by this persistent ID, including users' email addresses, postal addresses, IP addresses, and phone numbers. Zeta tells its investors it has more than 200 million profiles that contain these types of persistent identifiers.

78. Zeta also matches its Zeta ID to a "wide range of industry identifiers" offered by other third parties, like entities who use its DSP and SSP services. Zeta represents on its website that this combination of identifiers enabled Zeta to correctly identify "millions of events per day"—including who they belong to—across a network of "2,500+ publishers."

79. An example of the types of identifying information Zeta can capture while a consumer visits a retailer's website appears as follows:

```
{
    "customer_id": "CUST123456",
    "client_key": "CKEY789012",
    "hh_id": "HH987654",
    "loyalty_number": "LOYAL3210",
    "email": "johndoe@example.com",
    "email_md5": "e13743a7f1db7f4246badd6fd6ff54ff",   // MD5 hash of "johndoe@e
    "email_sha256": "2dcb9f3b5e3e555b5adfd91aae3c3f083b298a08e4862f9f7cfb6a88244
}
```


80. As a consumer continues to use a respective retailer's website for products and services, Zeta can continue to collect information, including name, address, and even information regarding a consumer's children:

```
{
    "first_name": "John",
    "last_name": "Doe",
    "gender": "Male",
    "children": [
        {
            "age": 5,
            "gender": "Female",
            "name": "Emily"
        },
        {
            "age": 7,
            "gender": "Male",
            "name": "Michael"
        }
    ],
    "address_line_1": "1234 Elm Street",
    "address_line_2": "Apt 5B",
    "city": "Anytown",
    "state": "Stateville",
    "country": "USA",
    "zip": "12345",
    "other_address": {
        "address_line_1": "5678 Oak Street",
        "address_line_2": "Suite 12",
        "city": "Othertown",
        "state": "Stateplace",
        "country": "USA",
        "zip": "67890"
```


81. The more granular the data collected on a respective consumer, the more value that individual profile holds. Below are additional details that Zeta can intercept:

JSON

```
{
    "resource_type": "product",
    "resource_id": "E_2M891AB",
    "First Seen": "01/01/2023",
    "Last Updated": "8 hours ago",
    "Modified Date": "01/01/2023",
    "Published Date": "02/01/2023",
    "Description": "A versatile shoe for both casual and formal occasic
    "age": "01/2023",
    "brand": "ElegantFootwear",
    "categories": "Men, Formal, Casual, Bestsellers, Clearance, Leather
    "color": "Black",
    "gender": "male",
    "in_stock": false,
    "offer_price": 50,
    "price": 100,
    "segment": "Adult",

}
```


82. Through the collection of thousands of data points, and in concert with Zeta's AI processing, Zeta creates its identifiable user profiles tied together through its proprietary Zeta ID, a persistent identifier. Those profiles contain a considerable amount of PII.

83. Any Zeta customer can view the data that Zeta intercepted from their web properties at any time. Zeta presents this information, including PII, in the ZMP platform.

84. Beyond just these profiles, Zeta also offers add-on information (if paid for by the ZMP subscriber) that includes the interests of a particular online user, an AI-based scoring chart for the likelihood that an online user falls into a certain demographic, and top activities that the online user has recently taken part in—such as purchase information, new online subscriptions, and returns of purchases.

85. Taken together, all of this PII is highly sensitive and something neither Zeta nor its customers should have ever had access to. Given that Zeta collects over 2,500 different identifiable data points on each consumer, Zeta has likely stored more information than what is publicly known.

86. Zeta's ZMP platform contains even more information that, also unbeknownst to consumers, is made available to Zeta's business customers. Specifically, ZMP contains a system called Zeta Audiences, which allow its clients to build audiences or segments of users from Zeta's consumer profiles. Notably, Zeta's customers are not limited to creating audiences based on their own customer data, but rather ***all*** data in Zeta's system.

87. Accordingly, Zeta's customers can create and activate audiences for targeted advertising that include enriched consumer attributes and prospects beyond their own customer lists—i.e., data they would not themselves have access to if using exclusively their own first-party data. These audiences and segments that Zeta makes available are highly specific, revealing private details about consumers in violation of their right to privacy:

a. **Online Content Consumption**: An online content consumption/behavioral data category. This includes information regarding online digital audiences who may be interested in various product categories.

b. **Visitation**: Visitation data captures real-world movement by tracking device locations through mobile application and GPS navigation systems. It provides insights into where consumers go and how often they visit specific locations.

c. **Transaction**: The transaction data category includes audiences that have completed a transaction within certain listed categories, thereby giving business customers the ability to target users that have shown explicit interest in listed areas.

d. **Financial & Household**: Financial and Household data segments provide insights into individuals based on financial health indicators, household characteristics, property ownership, and related lifestyle attributes.

e. **Demographics**: Demographic data groups people by general population characteristics, such as age, gender, ethnicity, and income.

f. **Multicultural Data**: Uses Natural Language Processing, census data, and cultural signals to identify ethnic and country-of-origin segments under four main umbrellas: White/Non-Hispanic White, African American, Hispanic, and Asian.

g. **Propensities**: Propensity audiences include customers with various brand, product, or service affinities.

h. **Psychographic**: Psychographic audiences include customers whose behaviors align with particular personalities, values, and attitudes.

i. **TV Engagement**: TV engagement audiences include various types of television viewers and their levels of content consumption.

j. **Firmographic**: Firmographic audiences provide a single, consolidated view of the professional attributes of a target audience, such as job title and industry, company name, company age, company revenue, and company size.

88. Once an audience is selected, Zeta provides even more information about the individuals contained in each respective audience.

89. For instance, according to Zeta's website, the "Hispanic-Serving Institutions" audience breaks down into the following additional categories: audience interests, education interests, non-education interests, transactions, visitation, financial & household, and geographic distribution, vehicle ownership, among others. Selecting education interest shows that members of

this audience are most interested in the University of Arizona. Selecting non-education interest shows that they are interested in certain individuals, such as Aaron Judge, as well as certain brands, like Puma, and even classifies the audience members as likely to be interested in "Low-income services." Selecting transactions reports shows where members of this audience are most likely to spend their money, listing Mac Cosmetics and other brands. And selecting visitation shows which brand locations they frequent the most, including Fry's and Vans Golf. Selecting financial and household reveals the financial attributes of the audience, such as the value of their home and wealth ranking. And, finally, geographic distribution reveals which states these audience members are from, including a zip code distribution providing even more granularity on their specific location. All of this is information that no individual website owner, either as a publisher or company incorporating Zeta's tracking pixel, would ever have access to.

90. Zeta processes this sensitive information and provides it to its algorithms that can make additional categorizations and determinations. This allow Zeta to provide its business customers with audiences of identifiable individuals who can be targeted for specific lines of business, including products and services. Some of the determinations made by ZMP's algorithms (and how they appear within the ZMP platform) include:

a. "Propensity Scores," which are ZMP data signals that score users based on their propensity to purchase a product. The data inputs that Zeta collects in order to create these scores include a user's:

   i. Discretionary spending;

   ii. Household income;

   iii. Net-worth;

   iv. Education completed;

v. Credit card usage;

vi. House price; and

vii. Number of adults in household.

b. "Multicultural Audience Filters," which are ZMP demographic filters that allow business customers to target users based on their race or origin.

c. "Advanced Location Targeting," which is ZMP's ability to allow business customers to not only target potential consumers based on general geographic region, but also based on precise location information including "city, state, zip code, and latitude/longitude."

91. By using all of this data, Zeta gives business consumers access to information that otherwise would not be available, all of which they can activate by using Zeta as either a DSP or SSP.

92. At a recent conference, Zeta discussed how its AI enables retailers to target specific potential consumers based on data that the retailer would otherwise not know. This includes knowing whether a consumer is making more money than they previously did (for example, as a result of a job promotion), whether the consumer made purchases evidencing disposable income, and whether the consumer is researching making additional purchases using that disposable income. An example slide evidencing what information Zeta provides is as follows:




93. Zeta calls access to all of this data and the assumptions that can be made off of it the "Golden Age of Personalization." In reality, it shows that Zeta feels emboldened to violate basic and fundamental privacy principles.

***Zeta's Misleading Representations***

94. For years, Zeta claimed that it collected all of its data through an opt-in system, meaning that consumers had to proactively agree to the collection of their data. Among elsewhere, Zeta claimed in its Form 10-K Annual Report for the fiscal year ended December 31, 2023 ("2023 Annual Report") that its datasets were the "industry's largest opted-in data set for omnichannel marketing." Zeta also made numerous representations to the public about the opt-in nature of ZMP's datasets. For example, previous Annual Reports contained similar opt-in language, and Zeta's promotional materials from 2022 claimed that Zeta's "database is permission-based, meaning everyone in the data cloud has opted-in."

95. These claims and representations were untrue.

96. At the Zeta Data Summit, Zeta's Chief Data Officer implicitly acknowledged that 110 million Americans whose data it included in the ZMP platform had only granted permission for email communications sent from specific websites, which cannot—in any reasonable sense of the word—constitute "opt-in" consent for Zeta to intercept, target, and profile individual consumers. For all 245 million Americans whose data is in Zeta's cloud, Gore also (incorrectly) suggested that Zeta obtained consent by relying on its own customers' terms of service. This too is untrue, as a review of some of Zeta's customers' terms and policies mention neither Zeta nor its omnipresent tracking and profiling of consumers.

97. The slide Gore showed explaining how Zeta purports to obtain consent appeared as follows:




98. According to Professor Ari Waldman of University of California (Irvine)'s School of Law, "[c]alling your data set the largest 'opted-in' data set and then admitting that less than half of the people in that data set are actually opted in is a straight up lie." This also underscores that

consumers are not cognizant or aware of the opt-ins that Zeta claims to have for them. According to Alan Butler, the Executive Director and President of the Electronic Privacy Information Center, "[Zeta's removal of 'opt-in' language underscores […] the fact that these types of purported consents to data collection are really not informed, knowledgeable, intentional choices by customers[.]"

99. In Zeta's 2024 Annual Report, Zeta removed references to ZMP's datasets being obtained through "opt-in" mechanisms, despite that its prior annual reports—including the 2023 Annual Report—affirmatively claims that all data in Zeta's system was "opted-in" data.

100. Consumers still are not publicly aware of how and where Zeta collects data. This is because Zeta's technology is designed to function secretly in a manner consumers cannot detect, such that they have no reason to suspect Zeta's technology is lurking in the background of websites they visit or email correspondence that they open or to review Zeta's policies.

***DotDash's Use of Zeta's "LiveIntent" Pixel Technology***

101. Zeta's data collection apparatus is included on numerous websites and secretly embedded in email correspondence sent from several companies to unsuspecting consumers. One of many such examples is DotDash, which owns a series of online newspapers and email newsletters.

102. Plaintiff Ayerdi subscribes to newsletters offered by DotDash, and her experience illuminates how companies like DotDash use Zeta, as well as how Zeta uses its LiveIntent pixel technology to intercept sensitive information.

103. On or about June 25, 2025, while in California, Plaintiff Ayerdi visited a website operated by Zeta's client, DotDash, at https://people.com. While on the website, Plaintiff Ayerdi subscribed to a newsletter offered by People, one of DotDash's brands, by submitting her email

address in a webform. Plaintiff Ayerdi then received an email newsletter from People and DotDash that contained Zeta's LiveIntent tracking pixel.

104. Immediately upon using https://people.com, Zeta began tracking Plaintiff Ayerdi through its LiveIntent tracking pixel. This pixel intercepted the full name of the article and other content viewed by Plaintiff Ayerdi, as well as several cookies used to identify her on the website and other metadata.

105. Upon opening the email newsletter, Zeta continued to track Plaintiff Ayerdi's online activities and compiled detailed information regarding Plaintiff Ayerdi's activities, habits, propensities, and interests through its pixel secretly embedded in this email correspondence.

106. The Newsletter Sign Up webform presented to Plaintiff Ayerdi, pictured below, did not ask or require Plaintiff Ayerdi to "opt-in" to the use of the LiveIntent pixel. In fact, the webform did not include any hyperlink at all. Nor did the webform present a hyperlink to any terms of service or any privacy policy:




107. After Plaintiff Ayerdi entered her email address by typing it in the "Email address" field and clicking "SIGN UP," the following screen appeared. Once again, there was no hyperlink to any terms of service or privacy policy.



108. The People.com email newsletter received by Plaintiff Ayerdi embeds a set of five invisible, sequential tracking pixels to transmit detailed, user-specific data to Zeta's LiveIntent subsidiary. This code is hidden in the email through "<img>" tags in the HTML code section of the email newsletter, differing only by the incrementing value of the "s" parameter.

109. The data collected includes Plaintiff Ayerdi's email address, campaign identifiers, Plaintiff Ayerdi's device and client information, and unique impression IDs, thereby providing an extensive dataset for ad targeting, analytics, and data sharing, all of which would be added to the existing profile Zeta maintained about Plaintiff Ayerdi. When the email is opened, the pixel transmits all the above data to Zeta's servers, along with the recipient's IP address and user agent (browser or device information) to LiveIntent's servers, including the recipient's email address, campaign, and unique identifiers.

110. LiveIntent receives these requests and uses them to log the open event and all associated metadata, initiate real-time bid requests to advertising partners using the recipient's data for targeting, and record which pixels were loaded, when, and from what device or IP address. The pixels thus collect data for real-time audience segmentation, cross-device and cross-campaign user identification, and feed behavioral data into broader advertising and targeting systems.

111. Including Plaintiff Ayerdi's email address in the pixel URL allows LiveIntent, Zeta Global, and their advertising and publishing partners to tie email engagement directly to an actual person. When the email is opened, the recipient's email address is transmitted in plain text to LiveIntent, enabling direct identification. Each open event is logged with device details, IP address, and campaign context, allowing for detailed behavioral profiling. LiveIntent, as an ad exchange, shares or sells access to this data to other advertisers, data brokers, or partners for further targeting and analytics.

112. This tracking was completely invisible to Plaintiff Ayerdi, as it is to each of the Class members who interact with websites and other digital mediums owned by customers of Zeta. The pixels are too small to be seen and are not disclosed anywhere in the visible content of the email. Plaintiff Ayerdi did not consent to this data sharing and had no knowledge that its existence was being used by Zeta to gather her personal information containing an average of 2,500 unique data points for resharing and resale to third and fourth parties.

113. At no point in time did Zeta or DotDash obtain consent. The bottom of the email newsletter from People showed only the following:




114. As seen, the email includes hyperlinks to DotDash's Privacy Policy and Terms of Service; however, Plaintiff Ayerdi was not required to click on those hyperlinks, read them, or assent to the Terms of Service or Privacy Policy before reading the newsletter, interacting with it, and having her data intercepted by Zeta.

115. Like Plaintiff Ayerdi, Plaintiff R.E.A., and Plaintiff K.G. also subscribed to newsletters that—unbeknownst to them—embedded Zeta's tracking pixel. This includes

Horoscope.com and All Recipes. When Plaintiff R.E.A. and Plaintiff K.G. opened these emails, the same data described above was intercepted by Zeta and fed into its existing user profiles.

116. Zeta acknowledges that the private and identifiable consumer data it obtains through its LiveIntent subsidiary contributes the "largest share" of data in its ZMP platform.

***The Quantifiable Value of Data***

117. The PII collected by Zeta as well as the other sensitive information and assumptions made by Zeta's AI is highly valuable.

118. According to Zeta, Zeta's Chief Executive Officer David Sternberg claimed in a November 14, 2024 investor webinar that the data collection practices Zeta uses are comparable to those used by Meta and Google. According to Sternberg, consumers participate in a "trade of value in exchange for them signing into our ecosystem." Sternberg continued, "[i]n 100% of the cases where we collect a consumer's data, there's a value exchange." This value exchange, according to Sternberg, consists of the monetary value of the data collected from consumers (and resold to Zeta's business customers) in exchange for consumers being able to do things like make comments on websites, share social media posts with loved ones, or apply to a job on a digital job board.

119. However, consumers with reasonable privacy expectations online do not consent to this so-called "exchange" nor are they adequately compensated for the use of their data or the invasion of their privacy rights.

120. Zeta has built a multibillion-dollar business based off the data it collects on consumers. Zeta's clients pay significant amounts just for rudimentary access to ZMP (usually between $70,000 to $110,00 per license) and pay higher amounts for additional data.

121. According to research by DataPods, in 2023, the average revenue per user ("ARPU") for the entire online advertising industry was approximately $263 per individual online user. Zeta itself also works off the ARPU model, calculating a specific data value for each business's scaled consumers for whom it collects or maintains data. In Zeta's 2023 Annual Report, Zeta states:

> During the year ended December 31, 2023, [Zeta] experienced an increase in our scaled customer [ARPU], which resulted in our revenues increasing for the year compared to the prior-year period. Our scaled customer ARPU growth resulted primarily from the initial effects of transitioning our sales team model to focus a dedicated team on new business development and a separate team on training and educating new and existing users on our platform capabilities. Our transition to this hunter/farmer sales model has included focusing more of our sales team on growth of existing scaled customers and aligning scaled customers with sellers that have specific industry expertise.

122. Indeed, the quantification of the specific value of consumer data is undeniable in the instance of Zeta's data collection apparatus because of the specifically calculated value it brings Zeta and its customers as measured on an annual basis. Further, Zeta's investor reports show the value of its customers' data as measured through an ARPU model, with the ARPU for its scaled customers reaching $1,572,000 in 2023 per customer as compared to $1,431,000 in 2022.

123. The identifying data Zeta intercepts and uses to ground its user profiles are particularly valuable. For instance, datarade.ai currently advertises a Datasys dataset of 10 million hashed emails (using common techniques, including SHA) for about $5,000 a month. Another dataset, offered by the company Irys, is specifically advertised as "identity data" containing device IDs, hashed emails, IP address, country code, and timestamps. A similar dataset, offered by Strista, likewise contains hashed email addresses and IP addresses, among other PII, and retails for $9,500 a month or $114,000 a year.

124. Accordingly, Zeta makes a substantial amount of quantifiable revenue based off the data it collects.

***<u>Plaintiffs and Class members Have a Reasonable Expectation of Privacy</u>***

125. Internet users, like Plaintiffs and Class members, do not expect to be tracked across every single one of their internet-connected devices, including on their web browsers, internet-enabled applications, connected TVs, and more. Surveys regarding online privacy reinforce this. For example, in a study by Flurry Analytics, 88% of Apple device users worldwide availed themselves of "Do Not Track" features with the expectation that their privacy rights would be protected.

126. Plaintiffs and Class members had no cognizance of, and did not expect that, Zeta would circumvent these protections and the desire of online consumers to remain anonymous.

127. Zeta itself is unknown to almost every single user for whom it holds a data profile. Zeta made no effort to inform consumers that it tracks or tracked them, nor that it targeted them across online services for profit.

128. Zeta did not have adequate consent to perform this type of omni-present, cross-device tracking using Plaintiffs' and Class members' unique identifiers, PII, and other sensitive information.

***<u>Defendants' Conduct Violates Established Data Privacy Regimes</u>***

129. The two core tenets of privacy law are (1) clear user consent, and (2) data minimization.

130. Defendants do not comply with either of these requirements.

131. Defendants make zero effort to ensure that Plaintiffs and Class members have awareness of where and how their information is used. Despite previously claiming that data

collection operates in an "opt-in" manner, Zeta collects information from third parties, like DotDash, that do not request or require consumer opt-in before collecting data.

132. Additionally, Zeta's creation of detailed consumer profiles and identifiers clashes with the concept of data minimalization, which requires that data be retained and stored only for a specific period of time in which the usage of that data is needed or necessary.

133. Defendants' privacy practices blatantly disregard consumer privacy and depart from generally accepted privacy norms and legal requirements.

***Tolling and Concealment***

134. The earliest that Plaintiffs and Class members could have discovered Defendants' conduct was shortly before the filing of this Action. Plaintiffs became aware of Defendants' conduct only through communications with counsel.

135. Plaintiffs and Class members, despite their due diligence, could not have previously discovered Defendants' conduct because Zeta made misleading statements regarding opt-in consent and how Zeta's technology works; failed to make adequate disclosures; and failed to inform Plaintiffs and Class members that it maintained a data profile on each member of the Class.

136. Zeta's interception of unique identifiers, including PII like email addresses and other private data information, as well as the assumptions made by ZMP's AI, is undetectable to an ordinary person.

137. Defendants had exclusive knowledge that Zeta's technology was tracking Plaintiffs and Class members across the internet.

138. Defendants' fraudulent conduct prevented Plaintiffs and Class members from discovering its conduct, which began as early as 2007. Zeta made repeated misleading

representations that all of the information it collected was done only with consent or "opt-in procedures."

139. Defendants were under a duty to disclose the nature and significance of Zeta's data interception and use practices but did not do so. Defendants are therefore estopped from relying on any statute of limitations by virtue of the discovery rule and doctrine of fraudulent concealment.

## CLASS ACTION ALLEGATIONS

140. This Action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure 23, Rules 23(a), 23(b)(1), and 23(b)(2). Plaintiffs bring this class action on behalf of themselves and all other similarly situated individuals. The nationwide class that Plaintiffs seek to represent is defined as follows:

> **Nationwide Class.** All natural persons in the United States for whom Defendants aggregated, collected, retained, sold, or otherwise profited from their PII or other private data

141. In the alternative to a nationwide class, Plaintiffs seek to represent the following statewide sub-classes pursuant to Federal Rules of Civil Procedure, Rules 23(a) and 23(b)(3):

> **California State Sub-Class.** All natural persons in the State of California for whom Defendants aggregated, collected, retained, sold, or otherwise profited from their PII or other private data.

> **North Carolina State Sub-Class.** All natural persons in the State of North Carolina for whom Defendants aggregated, collected, retained, sold, or otherwise profited from their PII or other private data.

> **New York State Sub-Class.** All natural persons in the State of New York for whom Defendants aggregated, collected, retained, sold, or otherwise profited from their PII or other private data.

142. Excluded from the Classes are (1) Defendants and Defendants' subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest;

(2) Plaintiffs' counsel; and (3) all judges assigned to hear any aspect of this litigation as well as their immediate family members.

143. Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

144. *Numerosity*. Plaintiffs do not know the exact number of Class members because such information is in the exclusive control of Defendants or others. Plaintiffs estimate that, due to the nature of the trade and commerce involved, as many as 230 million Class members exist, and that these Class members are geographically dispersed throughout the United States. Joinder of all Class member is therefore impracticable.

145. *Typicality*. Plaintiffs' claims are typical of those of other Class members because Plaintiffs, like every other Class member, were harmed by way of the same conduct as alleged herein. Plaintiffs advance the same claims and legal theories on behalf of themselves and all other Class members, such that there are no defenses unique to Plaintiffs. The claims of Plaintiffs and those of the other Class members arise from the same operative facts and are based on the same legal theories.

146. *Commonality*. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

i. Whether Defendants violated Plaintiffs' and the Classes' privacy rights;

ii. Whether Defendants engaged in unfair and deceptive conduct;

iii. Whether Defendants' acts and practices violate the California Invasion of Privacy Act;

iv. Whether Plaintiffs and Class members are entitled to damages and/or equitable relief, including injunctive relief, restitution, and disgorgement of profit into a constructive trust;

v. Whether Defendants were unjustly enriched; and

vi. The appropriate class-wide measure of damages, as well as whether Plaintiffs and Class members are entitled to such damages and other relief.

147. *Adequacy of Representation.* Plaintiffs will (and have) fairly and adequately represent and protect the interests of the Class members because Plaintiffs have no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class. The damages and infringement of rights that Plaintiffs suffered are typical of other Class members, and Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class. Plaintiffs have retained counsel experienced in data privacy class action litigation, and Plaintiffs intend to prosecute this action vigorously.

148. *Superiority of Class Action.* A class action is superior to other available methods for the fair and efficient adjudication of this controversy because the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members. Certification as a class action will preserve judicial resources by allowing the Class's common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

149. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class

members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

150. Adequate notice can be given to Class members by directly using information maintained in the Defendants' records.

151. *Predominance.* The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

152. This proposed class action does not present any unique management difficulties. Defendants have acted on grounds generally applicable to the Class, thereby making final monetary and injunctive relief appropriate with respect to the Class as a whole.

**FIRST CAUSE OF ACTION**
**VIOLATION OF 18 U.S.C. 2510, *et seq.***
**THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**(ON BEHALF OF THE NATIONWIDE CLASS)**
***Against Zeta***

153. Plaintiffs reallege and repeat each and every allegation set forth above.

154. The Electronic Communications Privacy Act ("ECPA") makes it illegal to intentionally intercept, or attempt to intercept, any wire, oral, or electronic communication and to disclose or use the contents of an unlawfully intercepted communication. 18 U.S.C. § 2511.

155. ECPA provides a private right of action to any person whose electronic communications are intercepted. 18 U.S.C. § 2520(a).

156. Zeta intentionally intercepted electronic communications that Plaintiffs and the Class exchanged with websites through its pixel, API, and other tracking tools.

157. Zeta intercepted the content of these communications, including what materials they viewed or content they read, simultaneous with these communications taking place.

158. The tracking mechanisms that Zeta uses to track Plaintiffs' and the Class members' communications; Plaintiffs' and the Class members' browsers; Plaintiffs' and the Class members' computing devices; and the code that Zeta placed or allowed to be placed on its website, are all "devices" within the meaning of 18 U.S.C. § 2510(5).

159. Plaintiffs and Class members did not consent to the Zeta's acquisition of their communications.

160. In disclosing the content of Plaintiffs' and Class members' communications relating to the purchase and use of goods, products, and services of Zeta's clients, Zeta had a purpose that was tortious, criminal, and/or designed to violate statutory and constitutional privacy provisions including:

a. The unauthorized disclosure of PII, which is tortious regardless of whether the means deployed to disclose the information violates the ECPA;

b. Intrusion upon Plaintiffs' and the Class members' seclusion;

c. The use of Plaintiffs' and Class members' data to create comprehensive profiles used for unauthorized ad targeting;

d. Trespass upon Plaintiffs' and the Class members' personal and private property; and

e. Violation of 18 U.S.C. §§ 1343, 1349 (attempt and conspiracy) which prohibit a person from "devising or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, transmits or causes to be transmitted by means of

> wire, radio, or television communication in interstate … commerce, any writing, signs, signals, pictures, or sounds for purpose of executing such scheme or artifice."

161. Zeta's scheme or artifice to defraud consists of the false and misleading statements in its privacy policy described herein.

162. Zeta acted with intent to defraud because it willfully invaded and took Plaintiffs' and Class members' property, including the property rights to their PII; their right to determine whether such information remains confidential; the right to determine who may collect and use such information for marketing; and the right to determine who has access to their devices and communications.

163. Zeta also acted with intent to defraud because it willfully invaded and took Plaintiffs' and Class members' property (their PII) with knowledge that it lacked consent or authorization to do so. A reasonable consumer would not understand that Zeta was collecting and transmitting their data to third parties.

164. Zeta acted with the intent to acquire, use, and disclose Plaintiffs' and Class members' PII and personal health information without their authorization or consent.

165. Plaintiffs and Class members have suffered damages because of Zeta's violations of ECPA, including that (1) Zeta derived valuable benefits from using and sharing Plaintiffs' and Class members' communications without their knowledge or informed consent and without providing compensation; (2) Zeta's actions deprived Plaintiffs and Class members of the value of their PII; (3) Zeta's actions diminished the value of Plaintiffs' and Class members' property rights in their PII; and (4) Zeta violated Plaintiffs' and Class members' privacy rights by sharing their PII for commercial use.

166. Plaintiffs and Class members seek relief including injunctive relief; actual damages and profits enjoyed by Zeta as a result of its violations of ECPA, or the appropriate statutory measure of damages, whichever is higher; punitive damages; and reasonable attorneys' fees and costs. 18 U.S.C. § 2520. Pursuant to 18 U.S.C. § 2520, Plaintiffs and Class members seek monetary damages for the greater of (i) the sum of the actual damages suffered by the plaintiff and any profits made by Defendant because of the violation or (ii) statutory damages of whichever is greater of $100 a day for each violation or $10,000.

**SECOND CAUSE OF ACTION**
**VIOLATION OF NEW YORK'S GENERAL BUSINESS LAW § 349**
**(ON BEHALF OF THE NATIONWIDE CLASS**
**OR, ALTERNATIVELY, THE NEW YORK STATE SUB-CLASS)**
***Against All Defendants***

167. Plaintiffs reallege and repeat each and every allegation set forth above.

168. Defendants are each considered a business under New York's General Business Law § 349 ("GBL § 349").

169. Defendants' business acts and practices are unfair and deceptive under GBL § 349. New York has a strong public policy of protecting consumers' online privacy rights, including online personal data.

170. Zeta violated GBL § 349 by, among other things, surreptitiously aggregating, collecting, retaining, selling, and otherwise profiting from Plaintiffs' and Class members' PII and other sensitive information. Zeta used tracking technology to track Plaintiffs' and Class members' activities on all websites containing Zeta's tracking technology, and through email correspondence embedding this technology, to create user profiles for Plaintiffs and Class members. Zeta also failed to disclose that they were collecting and selling access to this information, and to the contrary, Zeta misrepresentation that it collected data only with user "opt-in" consent.

171. DotDash violated GBL § 349 by, among other things, facilitating the use of Zeta's technology to intercept and collect Plaintiffs' and Class members' private data to develop comprehensive user profiles. DotDash failed to disclose its use of Zeta's technology, including on its website and in email correspondence.

172. Plaintiffs and Class members did not consent to any of this conduct. At no time did Defendants inform Plaintiffs or Class members that it was secretly using their PII and private activities and communications on websites to create user profiles used for targeted advertising.

173. Defendants' business acts and practices are also "unfair" because they are immoral, oppressive, unscrupulous and/or substantially injurious to consumers. The gravity of harm of Defendants' secret collection and use of consumer PII for advertising purposes is significant, and there is no corresponding benefit resulting from such conduct. Finally, because Plaintiffs and Class members were completely unaware of Defendants' conduct, they could not have avoided these harms.

174. By collecting and using Plaintiffs' and Class members' PII, Defendants have taken money or property from Plaintiffs and Class members and caused harm to Plaintiffs' and Class members' privacy interests. Plaintiffs and Class members seek all available damages, including statutory damages of $50 per violation for each Class member under GBL § 349.

## THIRD CAUSE OF ACTION
## VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200, *et seq.*
## CALIFORNIA'S UNFAIR COMPETITION LAW
## (ON BEHALF OF THE CALIFORNIA STATE SUB-CLASS)
***Against All Defendants***

175. Plaintiffs reallege and repeat each and every allegation set forth above.

176. The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17200.

177. Zeta engaged in unfair business practices by deploying tracking pixels, its API, and setting up consent farms for the purpose of collecting Plaintiffs' and California Class members' private data to develop comprehensive user profiles.

178. Zeta engaged in deceptive practices by falsely claiming that it does not sell data and by falsely claiming that all consumer identifying information and other data was collected only on an opt-in basis. In fact, Defendant Zeta does sell access to consumer data, much of which was collected using consent farming and inconspicuous tracking technology and therefore was not collected on an opt-in basis. Failing to disclose these practices constitutes false statements and/or material omissions of fact. Had Plaintiffs known that Defendants were intercepting and monetizing their communications and data, Plaintiffs would have avoided doing business with Defendant Zeta's clients.

179. DotDash engaged in unfair business practices by facilitating the use of Zeta's technology to intercept and collect Plaintiffs' and California Class members' private data to develop comprehensive user profiles.

180. DotDash engaged in deceptive practices by failing to disclose its use of Zeta's technology, including on its website and in email correspondence.

181. Both Zeta and DotDash engaged in unlawful acts and practices by violating each of the laws described herein, including Cal. Penal Code § 631 and the common law right to privacy.

182. Plaintiffs and California Class members were completely unaware of Defendants conduct and could not have anticipated these intrusions into their privacy through these unlawful, unfair, and deceptive practices. Accordingly, Plaintiffs and California Class members could not avoid the harm caused by Defendants.

183. Defendants' conduct was immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiffs and California Class members. The gravity of harm of Defendants' secret collection, disclosure and use of Plaintiffs' and California Class members' personal information and private data is significant, and there is no corresponding benefit from such conduct.

184. As a result, Plaintiffs and California Class members suffered a loss of property in the form of privacy violations, loss of control over their valuable data, and a failure to be compensated for the data collected and sold.

185. Defendants reaped unjust profits and revenues in violation of the UCL as a result of its unlawful and unfair conduct, including profits and revenues from its use of Plaintiffs' and California Class members' data in its targeted advertising and other services. Plaintiffs and Class members seek restitution and disgorgement of these unjust profits and revenues.

186. Plaintiffs and California Class members seek all monetary and non-monetary relief allowed under the statute and equity, including restitution; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief permissible under the UCL.

**FOURTH CAUSE OF ACTION**
**VIOLATIONS OF CAL. PENAL CODE § 631**
**CALIFORNIA INVASION OF PRIVACY ACT ("CIPA")**
**(ON BEHALF OF THE CALIFORNIA STATE SUB-CLASS)**
***Against All Defendants***

187. Plaintiffs reallege and repeat each and every allegation set forth above.

188. CIPA § 631 prohibits any person who, but means of any "machine, instrument or contrivance" or in "any other manner": (1) intentionally taps or makes an unauthorized connection with "any telegraph or telephone wire, line, cable or instrument;" (2) willfully and without consent

of "all parties to the communication" or in "any unauthorized manner" reads or "attempts to read" or "learns the contents or meaning of any message, report or communication while the same is in transit or passing over any wire, line or cable, or is being sent from, or received at any place" within California; (3) "uses or attempts to use, in any manner, or for any purposes, or to communicate in any way" information so obtained; or (4) from aiding, agreeing, employing or conspiring with "any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

189. Zeta is a person under CIPA § 631.

190. Defendants designed, created, conspired, and effectuated the interception and use of Plaintiffs' and California Class members' personally identifiable information and private communications in California because (1) Plaintiffs K.G. and Ayerdi are based in California, where Zeta intercepted their personally identifiable information and private communications; (2) it developed profiles on California citizens, including Plaintiffs; and (3) it partners and cooperates with companies in California —to use these user profiles, including those maintained on California citizens.

191. Zeta's technology (e.g., its pixel, API, and identity solution) and Plaintiffs' and California Class members' computers, mobile devices, and connected TVs, are a "machine, instrument, contrivance, or . . . other manner" under CIPA § 631.

192. At all relevant times, Zeta used its technology to make unauthorized connections with the lines of communication and instruments used by Plaintiffs and California Class members to access online services without the consent of all parties to those communications.

193. Zeta willfully, and without consent, read, or attempted to read, or learn the contents and meaning of Plaintiffs' and California Class members' communications with online services

while those communications were in transit or passing over a wire, line, or cable, or were being sent or received within California through its tracking technology, as described herein. This interception happened prior to or at the same time that the communications were received by the intended recipient.

194. Zeta used and attempted to use these identifiable, private communications without consent for its own benefit, including for data enrichment, profiling, and to facilitate targeted advertising—all for profit.

195. DotDash aided, agreed with, employed, and conspired with Zeta to intercept and use this data for profit, including by embedding Zeta's technology on its website and in email correspondence.

196. The interception and use of Plaintiffs' and California Class members' communications was without authorization or consent from Plaintiffs and California Class members.

197. Plaintiffs and California Class members have been harmed because of Defendants' conduct. Their PII and sensitive information has been intercepted, viewed, and used for targeted advertising and has not been destroyed. Plaintiffs and California Class members face an imminent threat of continued injury, as this data is still stored and used, such that Plaintiffs and California Class members have no adequate remedy at law.

198. Plaintiffs and California Class members seek statutory damages in accordance with CIPA § 637.2(a) which provides the greater of: (1) $5,000 per violation or (2) three times the amount of damages suffered by Plaintiffs and California Class members in an amount to be proven at trial, as well as equitable and injunctive relief.

**<u>FIFTH CAUSE OF ACTION</u>**
**VIOLATIONS OF CAL. PENAL CODE § 632**
**CALIFORNIA INVASION OF PRIVACY ACT (“CIPA”)**
**(ON BEHALF OF THE CALIFORNIA STATE SUB-CLASS)**
***Against Zeta***

199. Plaintiffs reallege and repeat each and every allegation set forth above.

200. CIPA § 632(a) prohibits entities from:

> intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

201. Section 632 defines “confidential communication” as “any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]”

202. Plaintiffs’ and California Class members’ communications to online services are confidential communications for purposes of § 632, because Plaintiffs and California Class members had an objectively reasonable expectation of privacy in this data.

203. Plaintiffs and California Class members did not reasonably expect a third party to collect any of their information from third party websites or email newsletters. Nor did they expect a third party to intentionally use an electronic amplifying or recording device to eavesdrop upon and record their confidential communications.

204. Plaintiffs and California Class members expected their communications would not be shared with Zeta, as there were no disclosures that Zeta would secretly eavesdrop upon or record their information and communications.

205. Zeta's pixel, API, and associated tracking technology on third party websites and embedded in email correspondence are electronic amplifying or recording devices for purposes of § 632.

206. By contemporaneously intercepting and recording Plaintiffs' and California Class members' confidential and identifiable communications with online services through this technology, Zeta eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

207. At no time did Plaintiffs or California Class members consent to Zeta's conduct, nor could they reasonably expect that their communications with online services would be overheard and recorded by Zeta.

208. Zeta utilizes these private communications for their own benefit, including to enrich and enhance the data, create comprehensive user profiles, and facilitate targeted advertising—all for profit.

209. Plaintiffs and California Class members have been harmed as a result of Zeta's conduct. Their private data has been intercepted, viewed, and used, and has not been destroyed. Plaintiffs and California Class members face an imminent threat of continued injury, as this data continues to be stored and used, such that Plaintiffs and California Class members have no adequate remedy at law.

210. Plaintiffs and California Class members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the California Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

**<u>SIXTH CAUSE OF ACTION</u>**
**VIOLATIONS OF CAL. PENAL CODE § 638.50 & 638.51**
**CALIFORNIA INVASION OF PRIVACY ACT ("CIPA")**
**(ON BEHALF OF THE CALIFORNIA STATE SUB-CLASS)**
***Against Zeta***

211. Plaintiffs reallege and repeat each and every allegation set forth above.

212. CIPA § 638.50(b) defines a "pen register" as a "device or process" that "records or decodes dialing, routing, addressing, or signaling information" that is "transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

213. Separately, CIPA § 638.50(c) defines a "[t]rap and trace device" as a "device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

214. CIPA § 638.51 prohibits a person from installing either a pen register or trap and trace device without a court order.

215. Zeta is a person under CIPA § 638.51.

216. Zeta implemented and installed its pixel, API, and other tracking technology—which are pen registers and/or trap and trace devices—on Plaintiffs' and California Class members' devices and browsers.

217. These processes captured "routing, addressing, or signaling information" because they intercept: (1) users' directly identifiable information, including email addresses; (2) unique user identifiers and IP addresses; and (3) other information and metadata indicating the recipient of the communication.

218. Zeta was not authorized by any court order to use a pen register or trap and trace device to record or capture Plaintiffs' and California Class members' routing, addressing, or signaling information.

219. Plaintiffs and California Class members did not consent to Zeta's installation of a pen register or trap and trace device on their devices and browsers.

220. Plaintiffs and California Class members have been harmed as a result of Zeta's conduct. Zeta did not have authorization to use pen registers and/or trap and trace devices to surveille and identify Plaintiffs and California Class members, or other routing, addressing, and signaling information revealing who the intended recipients of their communications were.

221. Plaintiffs and California Class members face an imminent threat of continued injury, as this data continues to be stored and used, such that Plaintiffs and California Class members have no adequate remedy at law.

222. Plaintiffs and California Class members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the California Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

## SEVENTH CAUSE OF ACTION

**Violation of the Comprehensive Computer Data Access and Fraud Act**
**Cal. Penal Code § 502 ("CDAFA")**
**(ON BEHALF OF THE CALIFORNIA STATE SUB-CLASS)**
***Against All Defendants***

223. Plaintiffs reallege and repeat each and every allegation set forth above.

224. The California Legislature enacted the CDAFA to "expand the degree of protection afforded . . . from tampering, interference, damage, and unauthorized access to [(including the extraction of data from)] lawfully created computer data and computer systems," finding and

declaring that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . forms of unauthorized access to computers, computer systems, and computer data," and that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals . . ." Cal. Penal Code § 502(a).

225. Plaintiffs' and California Class members' devices on which Zeta's embedded pixel, API, and other tracking technology is installed, including their computers, smart phones, and tablets, constitute "Computer system[s]" within the meaning of the CDAFA. *Id.* § 502(b)(5).

226. The data that Zeta accessed and collected from Plaintiffs' and Class members' devices constitute "Data" within the meaning of the CDAFA. *Id.* § 502(b)(8).

227. Zeta violated § 502(c)(1) of the CDAFA by knowingly accessing and using without permission Plaintiffs' and California Class members' devices in order to wrongfully obtain and use their personal data, in violation of users' reasonable expectations of privacy in their devices and data.

228. Zeta violated § 502(c)(2) of the CDAFA by knowingly and without permission taking, copying, and making use of Plaintiffs' and the California Class members' personally identifiable information from their devices.

229. Zeta's tracking technology incorporated on Plaintiffs' and the California Class members' devices constitute "computer services" within the meaning of the CDAFA. Zeta violated § 502(c)(3) by knowingly and without permission using those computer services, and/or causing them to be used.

230. Zeta violated § 502(c)(7) by knowingly and without permission accessing those devices, and/or causing them to be accessed.

231. Zeta and DotDash violated §§ 502(c)(6) and (c)(13) of the CDAFA by knowingly, and without permission from Plaintiffs and the California Class members, providing and/or assisting in providing the ability to access Plaintiffs' and the California Class members' personal data via Zeta's tracking technology.

232. Under § 502(b)(12) of the CDAFA a "Computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information." Zeta violated § 502(c)(8) by knowingly and without permission introducing a computer contaminant via its Tracking Technology incorporated on Plaintiffs' and the California Class members' devices, which intercepted their personal data. As described *supra*, the tracking technology is deeply hidden; Plaintiffs and California Class members had no way to remove it or opt out of its functionality.

233. Plaintiffs and California Class members suffered damage and loss as a result of Defendants' conduct. Defendants' practices have deprived Plaintiffs and the California Class members of control over their valuable property (namely, their sensitive personal data), the ability to receive compensation for that data, and the ability to withhold their data for sale.

234. Defendants' practices have also harmed Plaintiffs' and California Class members' devices and systems, as it causes data to be stored in Plaintiffs' and California Class members' local storage, impacts CPU load time, and takes up bandwidth. These usages are particularly important, as device batteries have only a finite number of charges before they need to be replaced, and most data plans have bandwidth caps after which users will be charged or experience slower load times.

235. Plaintiffs and the California Class members seek compensatory damages in accordance with CDAFA § 502(e)(1), in an amount to be proven at trial, and injunctive or other equitable relief.

236. Plaintiffs and California Class members have also suffered irreparable and incalculable harm and injuries from Defendants' violations. The harm will continue unless Defendants are enjoined from further violations of this section. Plaintiffs and California Class members have no adequate remedy at law.

237. Plaintiffs and the California Class members are entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Defendants' violations were willful and, upon information and belief, Defendants are guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294. Plaintiffs and the California Class members are also entitled to recover their reasonable attorneys' fees under § 502(e)(2).

## EIGHTH CAUSE OF ACTION
## VIOLATIONS OF ART. 1 (§ 1) OF CALIFORNIA'S CONSTITUTION RIGHT TO PRIVACY (ON BEHALF OF THE CALIFORNIA STATE SUB-CLASS)
***Against All Defendants***

238. Plaintiffs reallege and repeat each and every allegation set forth above.

239. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1. Plaintiffs K.G. and Ayerdi are both California residents whose privacy rights are protected by the California Constitution.

240. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and

(3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

241. The right to privacy in California's constitution creates a right of action against private and government entities.

242. Plaintiffs and California Class members have and continue to have a reasonable expectation of privacy in their personal information, identities, and private data, pursuant to Article I, Section I of the California Constitution. The manner in which Zeta intercepted this information—surreptitiously and without obtaining consent—defeated established privacy-mechanisms and social norms.

243. This conduct constitutes an extremely serious invasion of privacy that would be highly offensive to a reasonable person. Reasonable individuals do not expect that there is an entity intercepting, monitoring, monetizing, and disclosing all of their online activity, let alone using it to compile online profiles for profit.

244. Zeta's conduct violated the privacy of California Class members, including Plaintiffs. Zeta did not have consent to intercept their private information, let alone use it to profile and target Plaintiffs and California Class members.

245. Similarly, DotDash's conduct violates Plaintiffs' and California Class members' right to privacy. By adopting Zeta's pixel technology, DotDash enabled and facilitated the interception, use, and disclose of Plaintiffs and California Class members' private information.

246. DotDash disregarded its customers' privacy rights by adopting this technology, both on its website and email correspondence, and by failing to take any steps to disclose to Plaintiffs and California Class members that Zeta would intercept their private and identifiable data and sell access to it to third parties.

247. Plaintiffs and California Class members seek damages to compensate the harm to their privacy interests, among other damages, as well as disgorgement of profits made by Zeta and DotDash as a result of its intrusion upon seclusion.

248. Zeta and DotDash's conduct were intentional, knowing, and carried out with a conscious disregard for Plaintiffs' and California Class members' rights, Plaintiffs and California Class members are entitled to punitive and exemplary damages.

249. Plaintiffs and California Class members also seek any other relief the Court may deem just and proper.

**<u>NINTH CAUSE OF ACTION</u>**
**COMMON LAW INVASION OF PRIVACY**
**INTRUSION UPON SECLUSION/PUBLIC DISCLOSURE OF PRIVATE ACTS**
**(ON BEHALF OF THE CALIFORNIA STATE SUB-CLASS)**
***Against Zeta***

250. Plaintiffs reallege and repeat each and every allegation set forth above.

251. Under California common law, an individual has the right to control and protect their private information.

252. Zeta's collection, use, and disclosure of Plaintiffs' and California Class members' identifiable information and unique identifiers constitutes an intentional invasion of privacy.

253. Zeta's interception, use, and disclosure of Plaintiffs' and California Class members' private online communications, associated with unique Zeta IDs and user profile, is likewise an intentional intrusion upon Plaintiffs' and California Class members' solitude and unauthorized disclosure of private facts.

254. Plaintiffs and California Class members reasonably expected their identifiable information, alongside their online activity, would not be intercepted, used, or disclosed by an unknown third-party. Email addresses, like Zeta intercepted here, are particularly private because

they are directly identifiable, permanent identifiers. Plaintiffs and California Class members reasonable expected this information would remain private and confidential and would not be intercepted, used, and disclosed by third parties without their consent.

255. This expectation is particularly heightened given that there were no disclosures of Zeta's involvement in intercepting, using, and disclosing their personally identifiable information and online communications.

256. Plaintiffs and California Class members did not consent to, authorize, or understand Zeta's interception or use of their private data.

257. Zeta's conduct is highly offensive because it violates established social norms. Consumers do not expect to be surveilled whenever they use the internet, especially in light of state laws requiring companies to make adequate disclosures regarding their collection and use of data.

258. Zeta's conduct is also particularly offensive in light of the secretive nature in which it takes place. Plaintiffs and California Class members had no way of knowing Zeta's collected and shared their personally identifiable information and other online communications.

259. Indeed, that Zeta went out of its way to claim the data is intercepted, used, and disclosed was "opt-in"—when it was not—also makes its conduct especially offensive.

260. DotDash's conduct also constitutes an intrusion upon seclusion and disclosure of private facts. By adopting Zeta's pixel technology, DotDash enabled and facilitated the interception, use, and disclosure of Plaintiffs' and California Class members' private information.

261. DotDash disregarded its customers' privacy rights by adopting this technology, both on its website and email correspondence, and by failing to take any steps to disclose to

Plaintiffs and California Class members that Zeta would intercept their private and identifiable data and sell access to it to third parties.

262. Zeta and DotDash's conduct caused Plaintiffs and California Class members harm and injury, including a violation of their privacy interests.

263. Plaintiffs and California Class members seek damages to compensate the harm to their privacy interests, among other damages, as well as disgorgement of profits made by Zeta or DotDash as a result of its intrusion upon seclusion.

264. Zeta and DotDash's conduct were intentional, knowing, and carried out with a conscious disregard for Plaintiffs' and California Class members' rights. Thus, Plaintiffs and California Class members are entitled to punitive and exemplary damages.

265. Plaintiffs and California Class members also seek any other relief the Court may deem just and proper.

**TENTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(ON BEHALF OF THE NATIONWIDE CLASS)**
***Against All Defendants***

266. Plaintiffs reallege and repeat each and every allegation set forth above.

267. Defendants received benefits from Plaintiffs and Class members and unjustly retained those benefits at their expense.

268. Defendants received benefits from Plaintiffs and Class members in the form of the Plaintiffs' and Class members' highly valuable data, including PII, that Defendants wrongfully collected, disclosed and intercepted from Plaintiffs and Class members without authorization and proper compensation.

269. Defendants collected, disclosed, intercepted, stored, and used this data for their own gain, providing Defendants with economic, intangible, and other benefits, including highly

valuable data for analytics, advertising, and improvement of their platforms, algorithms, and advertising services.

270. Had Plaintiffs and Class members known of Defendants' misconduct, they would not have provided any of their valuable data to the applications or websites that Defendants used for aggregation or would have paid less for the services on those applications or websites.

271. Defendants unjustly retained these benefits at the expense of Plaintiffs and Class members because Defendants' conduct damaged Plaintiffs and Class members, all without providing any commensurate compensation to Plaintiffs and Class members.

272. The benefits that Defendants derived from Plaintiffs and Class members rightly belong to Plaintiffs and Class members. It would be inequitable for Defendants to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Action.

273. Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

**ELEVENTH CAUSE OF ACTION**
**JUDGMENT PURSUANT TO 28 U.S.C. § 2201, *et. seq.***
**THE DECLARATORY JUDGMENT ACT**
**(ON BEHALF OF THE NATIONWIDE CLASS)**
***Against All Defendants***

274. Plaintiffs reallege and repeat each and every allegation set forth above.

275. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal, state, and common laws described in this Amended Complaint.

276. Defendants owe and owed a duty of care to Plaintiffs and Class members, which required them to adequately secure Plaintiffs' and Class members' sensitive information.

277. Defendants still possess sensitive information regarding Plaintiffs and Class members.

278. Defendants' data security measures remain inadequate by virtue of their business models. Furthermore, the risk remains that further disclosure of Plaintiffs' and Class members' sensitive information will occur in the future.

279. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owe a legal duty to secure Plaintiffs' and Class members' sensitive information and to notify Class members whose data they collected and disclosed;

b. Defendants' existing data handling practices do not comply with their duties of care to safeguard this information, only use it for intended purposes, and prevent the disclosure of this information to third parties; and

c. Defendants continue to breach this legal duty through their existing business practices.

280. This Court should also issue corresponding injunctive relief requiring Defendants to employ adequate data handling practices consistent with legal and industry standards to protect Plaintiffs' and Class members' sensitive information, including the following:

a. Order that, to comply with Defendants' duties of care, Defendants must implement and maintain the following data handling measures, including but not limited to:

i. Disable all uses of Zeta's pixels, APIs, and associated tracking technology;

ii. Adopt express, written, opt-in consent before collecting, disclosing or using such pixels, APIs, and associated tracking technology in the future;

iii. Delete Plaintiffs' and Class members' data from all systems and servers;

iv. Adopt a privacy and data governance program, including, but not limited to, annual privacy risk assessments and independent audits.

281. If an injunction is not issued, Plaintiffs and Class members will suffer irreparable injury and will lack an adequate legal remedy to prevent further collection and monetization of their sensitive information. The risk of this is real, immediate, and substantial. DotDash continues to use Zeta's technology, resulting in the further disclosure of Plaintiffs' and Class members' data, and Zeta continues to harvest, use, and disclose Plaintiffs' and Class members' data to additional third parties.

282. The hardship to Plaintiffs if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Plaintiffs and Class members will likely be subjected to a substantial, continual threat of privacy violations and other related damages if an injunction is not issued. On the other hand, the cost of Defendants' compliance with an injunction is relatively minimal, and are merely steps that Defendants should have taken at the outset consistent with social norms, laws, and industry standards.

283. Issuance of the requested injunction would benefit the public by preventing unlawful collection, disclosure, and monetization of Plaintiffs' and Class members' sensitive information, preventing future injury to Plaintiffs and Class members.

## DEMAND FOR RELIEF

284. To remedy these illegal acts, Plaintiffs request that the Court issue the following relief:

a. Certify the Class and appoint Plaintiffs as the Classes' representatives;

b. Declare, find, adjudge and decree that the conduct of Defendants violates federal and state law;

c. Disgorge Defendants' profits from their unlawful data privacy scheme into a constructive trust;

d. Award Plaintiffs the costs of their suit, including reasonable attorneys' fees;

e. Award Plaintiffs their damages, in the amount to be determined by a jury, inclusive of statutory and/or treble damages as provided by the applicable federal and state laws;

f. Grant Plaintiffs and the Classes any such other relief to which they may be entitled and which this Court deems just and proper.

**JURY TRIAL DEMANDED**

285. Plaintiffs demand a trial by jury on all claims so triable under Federal Rule of Civil Procedure Rule 38(b).

Dated: November 20, 2025

Respectfully submitted,

By: */s/ Amanda Fiorilla*
Amanda Fiorilla
Christian Levis
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 110
White Plains, New York 10601
Tel.: (914) 997-0500
Fac.: (914) 997-0035
*clevis@lowey.com*
*afiorilla@lowey.com*

Gary E. Mason
Danielle Perry (*Admitted Pro Hac Vice*)
**MASON LLP**
5335 Wisconsin Avenue N.W., Suite 640
Washington, DC. 20015
Tel.: (202) 429-2290
*gmason@masonllp.com*
*dperry@masonllp.com*

*Interim Co-Lead Class Counsel*

Blake Hunter Yagman
**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP**
1330 Ave. of the Americas, Suite 23A
New York, New York 10019
Tel.: (929) 709-1493
*byagman@sshhzlaw.com*

*Interim Executive Committee Member*

Israel David
**ISRAEL DAVID LLC**
60 Broad Street, Suite 2900
New York, New York 10004
Tel.: (212) 350-8850
Fac.: (212) 350-8860
*israel.david@davidllc.com*

*Interim Executive Committee Member*

***Attorneys for Plaintiffs R.E.A., K.G., Diane Ayerdi, and the Putative Classes***